UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHER TATELBAUM,

        Plaintiff,

                             Case No.: 2:25-cv-10865

v.                                    Hon. Gershwin A. Drain

NORTH AMERICAN
COMPANY FOR LIFE AND
HEALTH INSURANCE,

        Defendant.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF No. 32] AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF No. 31]**

Plaintiff Asher Tatelbaum alleges that Defendant North American Company for Life and Health Insurance breached his life insurance policy by failing to pay out the death benefit proceeds upon the death of his wife, Debrah Tatelbaum, who was the insured under the policy. In contrast, Defendant asserts that the policy had already lapsed and terminated by the time that Mrs. Tatelbaum passed away.

Presently before the Court are the parties' cross-motions for summary judgment. The Court concludes that a hearing will not aid in the disposition of these motions and will determine the outcome on the briefs. E.D. Mich. L.R. 7.1(f)(2). For the following reasons, Plaintiff's Motion for Summary Judgment [ECF No. 32] is

1

DENIED, and Defendant's Motion for Summary Judgment [ECF No. 31] is GRANTED.

## I.   BACKGROUND

### A. The Policy

On February 18, 1992, Plaintiff Asher Tatelbaum and his wife, Mrs. Debrah Tatelbaum, took out a Flexible Premium Adjustable Life Insurance Policy (the "Policy") on Mrs. Tatelbaum's life for $100,000 with Defendant North American Company for Life and Health Insurance. *See* ECF No. 31-1, PageID.208.[1] Plaintiff was named the beneficiary of the Policy. ECF No. 1, PageID.44. Under the Policy's terms, the owner of the Policy decides the amount of premium due each period:

> **Planned Premium.** The Planned Premium is the premium which you wish to pay at the frequency elected. We will send to you reminder notices for the Planned Premium at this frequency unless it is monthly.
> …
> You may request in writing that the Planned Premium be increased or decreased. The increase or decrease is subject to the Premium Limitation provision of this section.[2]

ECF No. 31-1, PageID.217.

---

[1] Although Mrs. Tatelbaum was the policyholder, Plaintiff handled everything pertaining to the Policy. For ease, the Court refers to Mrs. Tatelbaum and Plaintiff throughout this Opinion as if they were both policyholders.

[2] The Premium Limitation provides that a premium will not be accepted if it would cause the policy not to qualify as life insurance under the Internal Revenue Code. ECF No. 31-1, PageID.218.

The Policy clarifies, however, that the Planned Premium may not be sufficient to keep the Policy in force. "There is no guarantee that the payment of the Planned Premiums will keep the policy in force until the Maturity Date." *Id.* at PageID.218. Rather, the Policy states that it "will lapse on any monthly anniversary that the Surrender Value[3] is not sufficient to cover the Monthly Deduction[4] due[.]" *Id.* Under the Policy, if a lapse occurs—i.e., if the surrender value of the Policy is not sufficient to cover the monthly deduction—the Policy enters a grace period of 61 days to allow for the payment of a premium which is enough to enable the monthly deduction to be paid. *Id.* Thereafter, "[i]f the necessary payment has not been received at the end of the Grace Period the policy will no longer be in force. Any Surrender Value will be sent to you. Any death occurring after the end of the Grace Period will not be covered." *Id.*

## B. Payments, Policy Performance, and Lapse

Plaintiff and Mrs. Tatelbaum elected to pay $35 monthly for the first two years of the Policy, and $13 monthly through year 35 of the Policy. ECF No. 1, PageID.44. They paid the premiums through a Pre-Authorized Check ("PAC") plan. Beginning

---

[3] The Surrender Value is the cash value of the Policy less any debt secured by the Policy. ECF No. 31-1, PageID.216. If there is no debt secured by the Policy—which is true in this case—the surrender value is equal to the cash value.
[4] The Monthly Deduction is the monthly administrative fee plus the monthly cost of insurance, plus the monthly cost of riders on the policy (if any). ECF No. 31-1, PageID.215.

in 1994, Plaintiff and Mrs. Tatelbaum authorized Defendant to withdraw a $13 monthly premium to pay for Mrs. Tatelbaum's Policy. *See* ECF No. 32-2, PageID.503. In 2000, Plaintiff and Mrs. Tatelbaum changed banks and filled out a new PAC form. *See* ECF No. 32-3, PageID.506. The new PAC form included an authorization clause which stated:

> I authorize the Company to initiate an automatic electronic payment from my account indicated above at the financial institution (Bank) indicated above and I authorize my Bank to honor the withdrawal(s). I authorize the adjustment of the dollar amount transferred from my account to correspond to periodic changes in the payment due under the terms of the policy.

*Id.* The terms and conditions of the PAC form further stated that "[i]n the event a charge is inadvertently not made, the Company may charge the account at a later date. You will be notified prior to an increase in the deduction which may occur due to periodic changes in the premium due under the terms of the policy, if any." *Id.*

In accordance with their elections, Plaintiff and Mrs. Tatelbaum paid $35 monthly for the first two years of the Policy and paid $13 monthly thereafter until the policy lapsed in 2024. ECF No. 31-2, PageID.224–25. Because of the low premium amount, the cash value and surrender value of the Policy began to decline around 2014. ECF No. 31-4, PageID.298–316. Defendant sent Plaintiff and Mrs. Tatelbaum annual reports that detailed the Policy's performance and projected performance, which Plaintiff received. *See id.*; ECF No. 31-3, PageID.283. Those reports indicated that the Policy's value was depleting. Furthermore, Defendant sent

separate notices to Plaintiff and Mrs. Tatelbaum in 2023, 2022, 2021, 2020, and 2019 that the Policy's projection indicated that it was at risk of lapsing within the next one to five years unless corrective action was taken. *See* ECF No. 31-8.

As of March 18, 2024, Mrs. Tatelbaum's coverage officially entered a grace period. ECF No. 31-5, PageID.374. In a letter dated March 21, 2024, Defendant purportedly informed Mrs. Tatelbaum that her policy had entered a grace period and that a payment of at least $3.64 was needed before May 18, 2024 or the policy would officially lapse and coverage would terminate. *Id.* In another letter dated April 18, 2024, Defendant purportedly informed Mrs. Tatelbaum again of the impending lapse. *Id.* at PageID.372. In a final letter dated May 20, 2024, Defendant purportedly informed Mrs. Tatelbaum that the policy lapsed on May 18 and that all coverage had ended, subject to possible reinstatement upon proof of insurability, underwriting approval, and receipt of the required premium. *Id.* at PageID.371. Although Plaintiff does not contest that Defendant generated these letters, Plaintiff *does* contest that the notices were mailed, as will be explained in more detail *infra*.

## C. Change of Address and Mailing

Around July 23, 2014, Mrs. Tatelbaum submitted a change of address form to Defendant listing an address on Fairfax in Southfield, Michigan, as her home address. ECF No. 31-6, PageID.377. This was Plaintiff and Mrs. Tatelbaum's daughter's and son-in-law's home. ECF No. 31-3, PageID.261. Plaintiff and Mrs.

5

Tatelbaum generally lived with their daughter and son-in-law when they spent time in the United States. *Id.* at PageID.263, 266. However, they also spent significant time living in Israel and would come back and forth between the two countries. *Id.* at PageID.265. While living in Israel, Plaintiff still had all his mail—including mail from Defendant—sent to his daughter's home. *Id.* at PageID.268–69. His daughter would take pictures of the mail, send it to Plaintiff over text message, and store the mail for him until he returned from Israel. *Id.*

Plaintiff's daughter lived at the Fairfax address until around September 2023. *Id.* at PageID.266. At that time, the daughter and son-in-law moved to an address on Sherfield Place in Southfield, Michigan. *Id.* However, Plaintiff did not notify Defendant about the change of address until November 14, 2024 (after the Policy had already lapsed and after Mrs. Tatelbaum's death). ECF No. 31-7, PageID.380. Accordingly, the mail Defendant generated and allegedly sent to Plaintiff and Mrs. Tatelbaum before November 2024 was sent to the Fairfax address.

Kristi Hill, a representative for Defendant, testified at her deposition that Defendant makes a record of mail that is returned as undeliverable and the reasons why. ECF No. 36-3, PageID.655. However, Hill explained that Defendant received no returned mail from Plaintiff and Mrs. Tatelbaum, even though their daughter and son-in-law moved. *Id.* at PageID.656. In addition, Hill testified that Defendant has an automated process that runs once a month and checks the addresses of their

6

policyholders against the National Change of Address database. *Id.* at PageID.657. Hill stated that there was no indication that Defendant received any notice from the National Change of Address database that Plaintiff's address had changed. *Id.* at PageID.658. Hill also explained the mailing process for letters, describing how they are automatically generated, printed, and brought to the mailroom for mailing. *Id.* at PageID.645. But Hill does not work in the mailroom and could not speak as to what happens after a letter gets to the mailroom. *Id.* at PageID.648–49.

Plaintiff's son-in-law, Chaim Klainberg, explained in an affidavit that after he and his wife moved to Sherfield Place in 2023, he submitted a U.S. Postal Service change of address request that directed all mail addressed to their family at the Fairfax address to be forwarded to their new address on Sherfield Place. ECF No. 34-1, PageID.542–43. He asserts that he has never noticed problems with mail not being forwarded. *Id.* at PageID.543. He further claims that he and his wife opened Plaintiff's and Mrs. Tatelbaum's mail for them while they were in Israel, and his wife would take pictures of their mail and send it to Plaintiff. *Id.* However, Klainberg never received the grace period and termination notices Defendant allegedly sent on March 21, April 18, and May 20, 2024 (during which time Plaintiff and Mrs. Tatelbaum were in Israel). *Id.* According to Klainberg, he and his wife were aware that Mrs. Tatelbaum was seriously ill around this time and would have promptly

7

informed Plaintiff and Mrs. Tatelbaum that her coverage was at risk of termination if they received such mail. *Id.* at PageID.544.

**D. Lawsuit**

Mrs. Tatelbaum passed away on September 30, 2024. *Id.* at PageID.543–44. After Mrs. Tatelbaum's death, Plaintiff filed a claim as the beneficiary of her life insurance proceeds. Defendant denied the death benefit because of the lapse in policy. Accordingly, Plaintiff brought this lawsuit alleging that Mrs. Tatelbaum was insured at the time of her death and that Defendant breached the insurance policy by failing to pay the death benefit upon receipt of Plaintiff's claim. *See* ECF No. 1.

In Plaintiff's Motion for Summary Judgment, he alleges that he is entitled to judgment as a matter of law because Defendant waived and is estopped from asserting lapse of Mrs. Tatelbaum's life insurance policy, as it failed to collect an increased premium under the PAC arrangement. *See* ECF No. 32, PageID.486. According to Plaintiff, the PAC form that he and Mrs. Tatelbaum filled out in 2000—which authorized automatic monthly withdrawals from their bank account— also authorized Defendant to adjust the dollar amount "to correspond to periodic changes in the payment due[.]" *Id.* at PageID.489–90. Plaintiff asserts that Defendant's failure to do so constitutes a waiver of lapse, and that Defendant should be "estopped from asserting lapse where nonpayment results from its own billing or

collection failure and the insured reasonably relied on the insurer's established practices." *Id.* at PageID.493.

In response, Defendant argues that the PAC form did not authorize Defendant to take out anything more than what Mrs. Tatelbaum elected to pay per month, because she had a Flexible Premium Life Insurance Policy that did not contain fixed periodic changes to the premium owed. ECF No. 36, PageID.594–95. Rather, the provision of the PAC form allowing Defendant to take out increased premiums necessarily only applied to Term Life Insurance Policies, where the premiums are fixed and increased at a set rate after the expiration of the term. ECF No. 36-3, PageID.638–39.

Defendant's Motion for Summary Judgment argues that it is an insured's duty to pay adequate premiums to fund a Flexible Life Insurance Policy and prevent surrender and that Plaintiff and Mrs. Tatelbaum failed to do so, which resulted in lapse. ECF No. 31, PageID.197. Defendant notes that it sent policy performance reviews to Plaintiff and Mrs. Tatelbaum for years which noted the Policy's declining value and the risk of lapse. Defendant also states that it mailed all correspondence to Plaintiff's last known address (Fairfax) regarding the lapse and grace period. *Id.* at PageID.203. And it provided Mrs. Tatelbaum with an adequate grace period under statutory law. *Id.* at PageID.204.

9

Plaintiff's argument in response is that Defendant has not proven that it mailed the March 21, April 18, and May 20, 2024 grace period and lapse notices. Although these letters were generated, Plaintiff notes that they are not signed by anyone in customer service and Defendant has not produced proof that the notices were actually put in the mail. ECF No. 34, PageID.538. Given that Klainberg testified that he submitted a change of address notice with the U.S. Postal Service, yet never received any forwarded notices from the Fairfax address, Plaintiff's contention is that Defendant never mailed them.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" by identifying portions of the record that demonstrate an absence of a material dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a "properly supported motion for summary judgment is made," the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must construe all reasonable inferences in favor of the nonmoving party when conducting its analysis. *Matsushita Elec. Indus. Co., Ltd.*

10

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It "may not make credibility determinations or weigh the evidence presented in support or opposition to a motion for summary judgment; only the finder of fact can make such determinations." *Doe v. Snyder*, 449 F. Supp. 3d 719, 727 (E.D. Mich. 2020).

## III.   DISCUSSION

### A. Plaintiff's Motion for Summary Judgment

Plaintiff's Motion for Summary Judgment argues that waiver and estoppel prevent Defendant from asserting that Mrs. Tatelbaum's Policy lapsed because Defendant failed to withdraw the necessary funds to keep Mrs. Tatelbaum's Policy active. Defendant argues, in contrast, that Defendant had no responsibility or right to withdraw more funds than the premium Mrs. Tatelbaum elected to pay each month.

Under Michigan law,[5] "an insurance contract must be enforced in accordance with its terms." *Henderson v. State Farm Fire and Cas. Co.*, 596 N.W.2d 190, 193 (Mich. 1999). In construing an insurance policy, "the language… must be given its ordinary and plain meaning, rather than a technical or strained construction." *Arco v. Travelers Ins. Co.*, 730 F. Supp. 59, 66 (W.D. Mich. 1989) (citing *Boyd v. Gen. Motors Acceptance Corp.*, 413 N.W.2d 683, 685 (Mich. Ct. App. 1987)). Where the policy is clear, it must be enforced as written. *Henderson*, 596 N.W.2d at 193. In

---

[5] The parties agree that Michigan law applies to this case.

contrast, an insurance policy may be considered ambiguous "when its terms may reasonably be understood in different ways[.]" *Arco*, 730 F. Supp. at 66 (citing *Raska v. Farm Bureau Mut. Ins. Co.*, 314 N.W.2d 440, 441 (Mich. 1982)). Notably, "[i]nsurance contracts must be interpreted by reading them as a whole." *Boyd*, 413 N.W.2d at 685. To establish a claim for breach of contract, a plaintiff must demonstrate (1) the existence of a contract, (2) a breach of that contract, and (3) damages suffered by the nonbreaching party as a result of the breach. *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018) (citing *Miller-Davis Co. v. Ahrens Constr., Inc.*, 817 N.W.2d 609, 619 (2012)).

A party to a contract may waive its rights under the contract. "[A] waiver is a voluntary and intentional abandonment of a known right." *Quality Prods. and Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003). "[W]hen a course of conduct establishes by clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms, the requirement of mutual agreement has been satisfied." *Id.* In addition, estoppel may apply to "hold a defendant insurer… liable for coverage that differs from the express terms of the contract." *Mate v. Wolverine Mut. Ins. Co.*, 592 N.W.2d 379, 382–83 (Mich. Ct. App. 1998). Estoppel arises only "when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts

12

to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." *Id.* (quoting *Lichon v. Am. Universal Ins. Co.*, 459 N.W.2d 288, 292 (Mich. 1990)).

Plaintiff's argument hinges on the PAC form that Plaintiff and Mrs. Tatelbaum filled out in 2000, which permitted Defendant to automatically withdraw their monthly premiums. That PAC form states that Plaintiff and Mrs. Tatelbaum "authorize the adjustment of the dollar amount transferred from my account to correspond to periodic changes in the payment due under the terms of the policy." ECF No. 36-2, PageID.622; *see also id.* ("You will be notified prior to an increase in the deduction which may occur due to periodic changes in the premium due under the terms of the policy, if any."). According to Plaintiff, this language allowed Defendant to withdraw, at its election, whatever amount necessary to keep the Policy in force.

Plaintiff's interpretation of the PAC form, however, ignores the terms of the Policy. Importantly, the PAC form specifically states that it allows for withdrawals of increased periodic payments due "*under the terms of the policy*." *Id.* (emphasis added). Accordingly, the Court must look at the terms of the Policy to determine what payment is due. The Policy is a Flexible Premium Adjustable Life Insurance Policy. By its plain terms, the "[p]remium may be in any amount subject to the Premium Limitations provision," and the premium is "the premium which *you wish*

13

*to pay* at the frequency elected." ECF No. 31-1, PageID.217–18 (emphasis added). The policyholder may "request in writing that the Planned Premium be increased or decreased." *Id.* at PageID.217. In other words, under the terms of the Policy, the policyholder determines what premium is due. There are no periodic changes in payment due under the terms of the Policy, and thus, Defendant had no right to withdraw more than Mrs. Tatelbaum's elected monthly premium of $13.[6]

This meaning is further exemplified by the fact that the Policy explains, in clear terms, that the premium the policyholder chooses may not be enough to keep the Policy in force. Rather, the Policy lapses if the premiums that the policyholder has elected to pay do not bolster the surrender value enough to cover the monthly deduction. *Id.* at PageID.218. Therefore, under the terms of the Policy, it is entirely up to the policyholder to determine what is paid each month and to ensure that they are paying enough to keep the Policy in force.

In short, interpreting the PAC form as permitting Defendant to withdraw any amount necessary to keep the Policy in force contravenes the entire structure and purpose of a Flexible Premium Adjustable Life Insurance Policy, which is premised on the policyholder choosing the amounts paid and having the responsibility of

---

[6] Indeed, on the PAC form itself, Plaintiff and Mrs. Tatelbaum specifically wrote in that the withdrawal amount for Mrs. Tatelbaum's policy was $13 monthly. ECF No. 36-2, PageID.622. That section of the PAC form states that it is for "flexible premium policies only." *Id.*

14

maintaining the policy's cash value. These are generally understood facts about this type of life insurance policy. *See Walby v. Aviva USA*, No. 11-CV-13312, 2013 WL 153379, at *6 (E.D. Mich. Jan. 15, 2013) ("[T]he policy lapse was caused by [the policyholder's] failure to comply with his duty as a policyholder to maintain a positive net cash value in his [Flexible Premium Adjustable Life Insurance Policy]."); *see also Akers v. Columbus Life Ins. Co.*, No. 17-34-HRW, 2018 WL 3494716, at *1 (E.D. Ky. July 19, 2018) ("[A] flexible premium life insurance policy gives the insured the ability to pay various premium amounts throughout the life of the policy. The only caveat to this flexibility is that the insured must make sure that there is enough paid into the policy in premium payments to cover the monthly cost and expenses[.]"); *Howard v. Sunset Life Ins. Co. of Am.*, No. 03-01-00407-CV, 2002 WL 24053, at *1 (Tex. Ct. App. Jan. 10, 2002) ("As the decision-maker regarding the flexible premiums, it was incumbent on [the policyholder] to monitor his policy and ensure he was paying sufficient premiums to maintain the policy.").

As Defendant's representative Kristi Hill explained, the language in the PAC form regarding increased premiums under the terms of the policy is applicable to Term Life Insurance Policies. ECF No. 36-3, PageID.638–39. In Term Life Insurance Policies, the premium due is fixed under the terms of the policy. After the term expires, the premium increases at a set rate as exemplified in the terms of the policy. *See id.*; ECF No. 36-4, PageID.695. In contrast, Flexible Premium Adjustable

Life Insurance Policies contain no set payment schedule. Rather, the policyholder elects the amount to pay—just as Plaintiff and Mrs. Tatelbaum elected $13 monthly when applying for coverage and filling out the PAC form. *See* ECF No. 1, PageID.44 (Mrs. Tatelbaum's insurance application, electing to pay $35 monthly for two years and $13 monthly thereafter); ECF No. 36-2, PageID.622 (the PAC form, where Mrs. Tatelbaum elected to pay $13 monthly).

Although Plaintiff's argument regarding the PAC form as applied to a flexible premium policy appears to be novel in Michigan, the Court has found at least one case in which a court addressed an identical argument under the same circumstances. In *Irving v. Wilco Life Insurance Company*, the plaintiff alleged that the insurer breached the Flexible Premium Adjustable Life Insurance Policy by terminating coverage when the policy's value was insufficient to cover the monthly expenses. No. 4:20-CV-80-DMB-RP, 2021 WL 1270465, at *4 (N.D. Miss. Apr. 6, 2021). According to the plaintiff, the insurer should have automatically withdrawn a sufficient payment from his bank account to keep the policy active pursuant to his "Authorization Agreement for Preauthorized Payments," and that the insurer's failure to do so estopped it from terminating coverage. *Id.* The insurer argued in response that under the Authorization Agreement, it did not have the authority to withdraw more than the plaintiff's elected monthly amount. *Id.*

16

The court agreed with the insurer, rejecting the plaintiff's contention that the insurer had the authority under the Authorization Agreement to withdraw any payment necessary to keep the policy in force. Rather, the court held that "the policy leaves premium amounts and frequency to the discretion of the insured… and the record does not reflect that [plaintiff] ever authorized" the increased payments necessary to keep the policy in force. *Id.* at *5. Likewise here: Plaintiff and Mrs. Tatelbaum never elected a different premium amount. Their elected monthly premium of $13, which Defendant withdrew according to the terms of the PAC form, was insufficient to keep the Policy in force.

As such, the doctrine of waiver cannot apply here. Defendant did not intentionally abandon a known right by not withdrawing more money from Plaintiff's account because it had no right to withdraw more than the premium amount that Plaintiff and Mrs. Tatelbaum elected. *Quality Prods. and Concepts Co.*, 666 N.W.2d at 258.

Nor has Plaintiff demonstrated that equitable estoppel should apply here. There is no evidence that Defendant engaged in any conduct that would have created the belief that it would withdraw more than the premium amount Plaintiff elected. *Mate*, 592 N.W.2d at 382–83. The PAC form does not state that Defendant will withdraw whatever amount necessary to keep the Policy in force. Rather, the PAC form states that Defendant will withdraw premiums pursuant to the terms of the

Policy. The Policy in this case provides that the policyholder chooses what he pays and does not include any provision for increases in premium outside of what the policyholder elects. There is no evidence that anyone employed with Defendant ever informed Plaintiff otherwise. Indeed, Defendant sent Plaintiff annual notices since at least 2007 demonstrating that the Policy was expected to lapse in 2024 at the current premium he was paying. ECF No. 31-4. Defendant also sent lapse warnings from 2019 to 2023 specifically warning Plaintiff that the Policy was "at risk of lapsing within the next one to five years unless corrective action *is taken by you.*" *See* ECF No. 31-8, PageID.384 (emphasis added). In short, there is simply no evidence of conduct by Defendant that could have induced Plaintiff to believe that Defendant would withdraw any amount necessary to keep the Policy in force. The evidence only suggests that Defendant was forthright about the risk of lapse without Plaintiff's corrective action.

Additionally, Plaintiff's reliance on the belief that Defendant would withdraw more than the elected premium amount was not justifiable. Although it is often a question of fact for the jury whether a plaintiff's reliance was "justifiable" (in other words, "reasonable"), it is "not inherently immune to summary disposition upon a finding that there is no genuine question of material fact." *Twp. of Rose v. Devoted Friends Animal Soc'y*, No. 356599, 2022 WL 1194623, at *4 (Mich. Ct. App. Apr. 21, 2022). Here, Plaintiff had no basis to believe that Defendant would withdraw

18

more than the elected premium amount. The terms of his policy did not allow for any withdrawal more than what Plaintiff elected. There is no indication that Defendant ever withdrew more than the premium that Plaintiff elected. And all of Defendant's communications to Plaintiff over a course of several years were clear that the Policy would lapse and that corrective action by Plaintiff was required to prevent it. *See Aastad v. Edwards*, No. 293101, 2010 WL 4679699, at *2 (Mich. Ct. App. Nov. 18, 2010) (rejecting plaintiff's argument that the insurer should be equitably estopped from asserting its limitations defense, noting that the policy provisions and the insurer's communications to plaintiff about the limitations on claims were clear and unambiguous).

Accordingly, Plaintiff has not established that Defendant breached the Policy because it was terminated prior to Mrs. Tatelbaum's death and the waiver and estoppel arguments are inapplicable. For these reasons, Plaintiff's Motion for Summary Judgment [ECF No. 32] is denied.

## B. Defendant's Motion for Summary Judgment

Defendant argues that it is entitled to summary judgment because Plaintiff fails to demonstrate breach of contract as a matter of law. It argues that it was Plaintiff's duty to pay adequate premiums; the Policy lapsed according to its terms; Defendant provided adequate notice to Plaintiff's last known address; and Defendant provided an adequate grace period. Plaintiff responds that there is a question of fact

19

regarding whether Defendant mailed the grace period/termination notices on March 21, 2024, April 18, 2024, and May 20, 2024. In reply, Defendant contends that Plaintiff's evidence has not established a genuine issue of material fact, and in any event, any failure to mail grace period/termination notices does not prevent the termination of coverage.

Under Michigan law, "[e]ach universal life insurance policy shall contain [a] provision[]… [t]hat written notice shall be sent by the insurer to the policyowner's last known address at least 30 days prior to termination of coverage. A flexible premium universal life insurance policy shall provide for a grace period of at least 30 days after lapse with lapse occurring on the date on which the net cash surrender value first equals zero or as otherwise defined in the policy." Mich. Comp. Laws § 500.4037(g).

Defendant submitted evidence of three notices that were automatically generated when Mrs. Tatelbaum's policy lapsed: the first grace period notice dated March 21, 2024 (three days after the Policy lapsed); the second grace period notice dated April 18, 2024 (a month after the Policy lapsed); and the termination notice dated May 20, 2024 (indicating that the grace period had ended and that coverage was terminated). *See* ECF No. 31-5. All the letters show that they are addressed to Mrs. Tatelbaum at the Fairfax address. *See id.* Defendant's representative, Kristi Hill, explained that these notices are not signed by anyone at the company and are

automatically "generated by the [computer] system" upon a policy's lapse. ECF No. 34-2, PageID.558. Once a letter is generated, the system automatically prints it, and it is brought to the mailroom for mailing. *Id.*

Plaintiff disputes that these letters were mailed. He notes that Defendant has not produced any proof of mailing through mailing logs, system records, or witnesses. ECF No. 34, PageID.538. He also submits the affidavit of his son-in-law, Chaim Klainberg, who states that he submitted a mail forwarding request to the U.S. Postal Service directing that all mail be forwarded to their new address on Sherfield Place. Despite signing up for mail forwarding to the new address, he never received the notices purportedly mailed in March, April, and May 2024. ECF No. 35, PageID.575. From these facts, Plaintiff argues that there is a question of fact whether Defendant actually mailed the notices at all.

Defendant's initial argument is that Plaintiff's evidence fails to present a genuine question of material fact. Although a court must view evidence in the light most favorable to the nonmoving party when ruling on a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Lossia*, 895 F.3d at 428 (quoting *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586). "The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence

21

on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 252).

Defendant asserts that Klainberg's affidavit is self-serving and not reasonably believable. Defendant notes that it consistently and successfully mailed notices related to the Policy to Plaintiff for over thirty years when it had Plaintiff's correct address, and that Plaintiff resumed receiving mailings from Defendant once he informed Defendant about the change of address to Sherfield Place. Accordingly, the only time Plaintiff allegedly did not receive notices was when he had moved and failed to notify Defendant of his change of address. ECF No. 37, PageID.700. Defendant claims that no reasonable jury could conclude that Defendant failed to mail these three notices.

Defendant presents a compelling argument. It is undisputed that Defendant's computer system generated the notices for Mrs. Tatelbaum. Kristi Hill testified that when these notices are generated, they are automatically sent to the mailroom for mailing.[7] It is also undisputed that Plaintiff neglected to inform Defendant of his

---

[7] Notably, the Michigan Court of Appeals has suggested that sufficient evidence of a company's business practices may create "a presumption that it mailed the grace period notices required by the policy." *Payne v. Ohio Nat'l Life Assurance Corp.*, No. 344060, 2019 WL 6173674, at *3 n.2 (Mich. Ct. App. Nov. 19, 2019). Here, testimony of Kristi Hill established Defendant's business practices that grace period notices are computer generated, automatically printed, and sent to the mail room for mailing. Moreover, Plaintiff's thirty successful years of receiving Defendant's mailed correspondence suggests that Defendant's business practices pertaining to mailing are regular and dependable.

change of address, and that Defendant did not know Plaintiff's true address until Plaintiff submitted a change of address form in November, after the lapse and Mrs. Tatelbaum's death. It is also undisputed that Plaintiff successfully received every mailed correspondence for over thirty years when Defendant had Plaintiff's correct address, and that Plaintiff began successfully receiving mailed correspondence again as soon as he informed Defendant of his new address at Sherfield Place. The only piece of evidence Plaintiff has presented in opposition is the affidavit of Klainberg, who simply claims that he did not receive the notices at Sherfield Place and that the U.S. Postal Service should have forwarded the mail from Fairfax because he submitted a mail forwarding form.

"Summary judgment does not require a court to draw every possible inference, no matter how stretched, in the nonmovant's favor. It requires only '*reasonable* inferences.'" *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1061 (6th Cir. 2024) (quoting *Kinlin v. Kline*, 749 F.3d 573, 576 (6th Cir. 2014)). To defeat summary judgment, evidence must be "significant[ly] probative[.]" *Id.* (quoting *Green Genie, Inc. v. City of Detroit, Mich.*, 63 F.4th 521, 526 (6th Cir. 2023)). "If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party, the motion should be granted." *Cox v. Ky. DOT*, 53 F.3d 146, 150 (6th Cir. 1995). Plaintiff's tangential evidence about the U.S. Postal Service mail forwarding is more akin to a scintilla of evidence than evidence

23

that creates a genuine question of fact. On the whole record, it is difficult if not entirely unreasonable to believe that the only time Defendant ever failed to mail correspondence to Plaintiff just happened to be during the period where Plaintiff failed to notify Defendant of his change of address.

Nevertheless, the Court need not decide whether Plaintiff has presented a genuine question of fact on this issue, because it would not matter if Defendant did not mail the notices. As stated *supra*, Michigan law requires life insurance policies to contain a provision that obligates the insurer to send the policyowner a notice that coverage has entered a grace period at least 30 days before coverage terminates. Mich. Comp. Laws § 500.4012(b). However, as the Michigan Court of Appeals has noted, "MCL 500.4012 does not indicate any consequence… for an insurer's failure to actually send written notice to the policyowner 30 days before terminating the policy[.]" *Kolk v. Household Fin. Corp. III*, No. 337178, 2018 WL 521903, at *8 (Mich. Ct. App. Jan. 23, 2018).

In the *Kolk* case, the decedent entered into a mortgage agreement with the defendant and simultaneously obtained optional credit life insurance. *Id.* at *1. Under the terms of the life policy, coverage would be terminated if the policyholder was two months delinquent in making the required monthly premium payments. *Id.* at *2. After several years of coverage, the decedent failed to make two premium payments and the defendant terminated the life insurance coverage. *Id.* at *3.

24

Thereafter, the decedent passed away and her family made a claim for the life insurance proceeds, which the defendant denied due to the policy not being in force at the time of her death. *Id.* The plaintiff, who was the son of the decedent, sued the defendant. One of the plaintiff's arguments was that the defendant failed to send the termination notices required under § 500.4012(b), and therefore, the decedent's policy remained in force. *Id.* at *7.

The Michigan Court of Appeals rejected this argument. It noted that the statute does not prescribe any consequence for failing to send notice, and the plaintiff cited "no authority for the proposition that the failure to strictly comply with the 30-day notice provision of MCL 500.4012(b) results in keeping the life insurance policy in effect indefinitely despite the insured's continued failure to pay the premiums." *Id.* at *8. Rather, because the statute is silent as to the consequences, the court applied the fundamental contract principle of repudiation to determine which party committed a material breach entitling the other to repudiate the contract. *Id.*[8] It

---

[8] A party is entitled to repudiate a contract when the other party has committed a material breach. *Walker & Co. v. Harrison*, 81 N.W.2d 352, 355 (Mich. 1957). But a party's determination that there has been a material breach is "fraught with peril," because if a court later determines that a breach was *not* material, "the repudiator himself will have been guilty of material breach and himself have become the aggressor, not the innocent victim." *Id.* The Michigan Supreme Court laid out the following factors that may be "influential" in determining when a breach is material:

    (a) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;

    (b) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;

25

concluded that the defendant's failure to mail the notice prescribed by § 500.4012(b) was not a material breach because the defendant had sent the decedent a different notice about the imminent lapse, yet the decedent did nothing about it, and there was no allegation that there was any deficiency in the notice that the decedent *did* receive. *Id.* at *9.

However, the court concluded that the decedent's failure to pay premiums *was* a material breach. *Id.* It held that "an insured's failure to pay insurance premiums justifies the insurer's cancellation of the insurance policy pursuant to the terms of that policy, even if there may not have been strict compliance with a statutory notice provision, so long as there are no other public policy considerations that would warrant voiding the insurer's attempt to terminate the policy." *Id.* at *9. When determining if public policy considerations supported voiding the defendant's termination of the policy, the court noted that the plaintiff failed to cite authority "to support the untenable notion that Michigan public policy favors requiring an insurer

---

(c) The extent to which the party failing to perform has already partly performed or made preparations for performance;
(d) The greater or less hardship on the party failing to perform in terminating the contract;
(e) The wilful, negligent or innocent behavior of the party failing to perform;
(f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract.

*Id.*

26

to provide indefinite coverage to an insured who has knowingly failed to pay insurance premiums—thereby neglecting the insured's most basic and fundamental obligation under the insurance contract[.]" *Id.*

*Kolk* is directly analogous to the instant case. Similar to the decedent in *Kolk*, Plaintiff received many notices from Defendant that the Policy would lapse without corrective action. "There is no contention in this case that the decedent did not actually have notice that her… life insurance policy would be terminated" without corrective action. *Id*. at *8. It is undisputed that Plaintiff received yearly Policy performance updates, and since at least 2007 those updates indicated that Mrs. Tatelbaum's Policy was likely to lapse in 2024. *See* ECF No. 31-4. Plaintiff also received specific warnings in the five years leading up to the Policy's lapse indicating that the Policy would be lapsing within the next 1–5 years without corrective action. ECF No. 31-8. Plaintiff makes no claim that any of the information he received from Defendant about the Policy was insufficient to inform him about the Policy's imminent lapse.[9] And like the decedent in *Kolk*, there is no evidence that Plaintiff attempted to pay Policy premiums after the coverage terminated or that

---

[9] Indeed, Plaintiff had his own Flexible Premium Life Insurance Policy with Defendant that he surrendered because he noticed the cash value diminishing when he received the same policy performance notices. ECF No. 31-3, PageID.277–78. Plaintiff understood that the cash value would continue to deplete without corrective action by him. *See id.* In other words, Defendant's notices were sufficient to apprise Plaintiff about declining cash value of Flexible Premium Life Insurance Policies.

27

the "motivation for ceasing to pay [the] insurance premiums was any alleged deficiency" in the notices he received. *Kolk*, 2018 WL 521903, at *9. Even if Defendant failed to send a grace period notice as prescribed in § 500.4012(b), it was not a material breach.

On the other hand, Plaintiff's failure to pay adequate premiums to maintain a sufficient cash value is a material breach: it "justifies the insurer's cancellation of the insurance policy pursuant to the terms of that policy, even if there may not have been strict compliance with a statutory notice provision[.]" *Id.* at *8. Despite the notices and warnings that Plaintiff received over many years about the Policy's declining performance and nearing lapse, Plaintiff did not take corrective action for over a decade that the Policy's value declined, and he "thereby neglect[ed] [his] most basic and fundamental obligation under the insurance contract." *Kolk*, 2018 WL 521903, at *9; *see also Walby*, No. 2013 WL 153379, at *6 (stating that it is a policyholder's "duty… to maintain a positive net cash value in his [Flexible Premium Adjustable Life Insurance Policy].").

Moreover, Plaintiff "has not cited any authority to support the untenable notion that Michigan public policy favors requiring an insurer to provide indefinite coverage to an insured who has knowingly failed to pay [the] insurance premiums" necessary to keep the Policy in force. *Kolk*, 2018 WL 521903, at *9. The closest argument Plaintiff makes is that Michigan courts disfavor forfeiture for nonpayment

of premiums. But the cases Plaintiff cites in support of this proposition are distinguishable because they rely on theories of waiver and estoppel to reach that result—theories the Court has already rejected in this case. *See, e.g.*, *Ruddock v. Detroit Life Ins. Co.*, 177 N.W. 242, 248 (Mich. 1920) (noting that courts apply waiver and estoppel in insurance cases where the company leads the insured to believe that it would not enforce a forfeiture or breach); *Hoyle v. Grange Life Assurance Ass'n*, 183 N.W. 50 (Mich. 1921) (applying waiver and estoppel where the company told the plaintiff that a health certificate was not necessary to reinstate coverage and later denied coverage for want of a health certificate).

Accordingly, the Court agrees with Defendant that Plaintiff has not established that Defendant breached the insurance contract by denying life insurance coverage and refusing to pay death benefits under the Policy. Defendant is entitled to summary judgment.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [ECF No. 32] is DENIED, and Defendant's Motion for Summary Judgment [ECF No. 31] is GRANTED.

**SO ORDERED.**

Dated:  June 26, 2026                    /s/Gershwin A. Drain
                                         GERSHWIN A. DRAIN
                                         United States District Judge

29